## CLARK, *Adm'r*, *v.* CLOUGH & *a.*, *Tr's.*

The statutory protection to executors and administrators against the testimony of the adverse party (G. L., c. 228, s. 16) applies to suits in equity as well as at law, and extends to all persons holding the estate of a deceased person in an official, representative capacity.

Advantage of an irregular foreclosure of a mortgage must be taken within a reasonable time.

Continuous, open, and exclusive possession of lands, for more than twenty years under claim and color of title, perfects the legal title without regard to the validity of the colorable title or to the defects in the proceedings conferring it.

Where a mortgagor allows the mortgagee to hold possession of the mortgaged premises for twenty years without accounting and without admitting he possesses a mortgage title only, he loses his right to redemption, and the title of the mortgagee becomes as absolute in equity as in law.

In the absence of fraud or deception, the title of an attorney to lands acquired by the purchase and foreclosure of mortgages against his client is not invalidated by the relation.

A release under seal is conclusive between the parties; unless there is fraud in obtaining it, and if given to one in possession of lands, whether by right or by wrong, by one having a right thereto, will operate to pass such right.

When the facts show gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights, equity will generally refuse to interfere ; and cases of trust constitute an exception only so long as the relation continues.

The administrator of an insolvent estate, as the representative of the creditors, and in the absence of laches on their part, may impeach the fraudulent conveyances of his intestate.

BILL IN EQUITY, for an accounting, and for the discharge of certain mortgages, by Moses Fellows, since deceased, against Clough and Foster, as executors of Herman Foster, or as trustees under his will, and certain other persons interested in his estate. The defendants, Clough and Foster, having filed an answer, the cause was sent to a master, who reported as follows:

Herman Foster died February 17, 1875. He left a will, in which John Foster and Lucien B. Clough were named as executors and trustees,—the will providing that the trustees and the survivor of them should hold what remained, after paying certain legacies, in trust, to pay over the income to his wife during her life, with power to sell the real estate with her consent. The executors named accepted the trust, and on the 27th day of February, 1877, filed their account as such executors. The following day they filed their bond as trustees. Among the property that came into their hands as trustees was a parcel of real estate located upon Elm street, in Manchester, which was appraised at $55,000, and which was called the Merrimack block.

This bill in equity was brought by Moses Fellows, November 3, 1877, against said John Foster and Clough, and all other persons who had any interest under said will.

Moses Fellows died September 25, 1879, and Joseph B. Clark was appointed administrator of his estate, and assumed the prosecution of this suit.

It was proved that Moses Fellows once owned the land and buildings known as Merrimack block, which covered lots 293–296 inclusive, as designated in the original laying out, except a part of lot No. 293. He also owned a part of lots 291 and 292. It was proved by record evidence that Fellows mortgaged lots 295 and 296 to the Amoskeag Manufacturing Company, September 26, 1844; that the company brought a writ of entry at common law against Fellows, upon the mortgage, October 11, 1851, and recovered conditional judgment November 22, 1851, for $601.81 debt and $10.88 costs; that the mortgage and judgment were assigned, January 30, 1852, to Herman Foster, for the consideration of $608.62; that said Foster, as assignee, was put in possession by an officer, upon a writ of possession, August 30, 1854. It was further proved by record evidence that Moses Fellows mortgaged to Joseph S. Lund, August 4, 1845, lots 295 and 296, and so much of lot No. 293 as he owned. September 3, 1852, Lund assigned the mortgage to E. J. M. Hale for the consideration of $2,131.25, the balance then due upon it. Said mortgage was never foreclosed.

It was further proved, by record evidence, that Fellows, September 9, 1846, mortgaged to George K. Montgomery lots 295 and

296, five feet in width, on the south side of lot No. 294, and so much of lot No. 293 as he owned; that January 15, 1847, Montgomery assigned the mortgage to E. J. M. Hale; that April 5, 1852, Hale brought a writ of entry upon the mortgage against Fellows, and May 8, 1852, recovered conditional judgment for $13,877.83 debt, and $11.13 costs; that October 29, 1852, a writ of possession was issued, and that, January 13, 1853, Hale was put in possession upon the writ by an officer.   October 15, 1853, Hale assigned the Montgomery mortgage and judgment, and the Lund mortgage, previously assigned to him, to Herman Foster, for the consideration of $17,210.87, of which sum $5,210.87 was paid in cash, $2,000 by a note payable in one year, and the remaining $10,000 by a note payable in ten years.   By a deed bearing date January 16, 1854, but acknowledged January 24, 1854, Hale quitclaimed all his interest in the property covered by the Lund and Montgomery mortgages to Herman Foster.

It was further proved, by record evidence, that Fellows executed to the city of Manchester a mortgage bearing date September 20, 1851, which covered lots 294, 295, 296, all that Fellows owned of lot No. 293, and also so much of lots 291 and 292 as he owned. January 13, 1852, the city assigned said mortgage to J. T. P. Hunt; March 22, 1852, Hunt brought a writ of entry upon the mortgage, and May 8, 1852, recovered conditional judgment for $2,698.80 debt and $6.88 costs.   April 29, 1853, Hunt assigned the mortgage and judgment to Isaac Tompkins, and May 13, Tompkins assigned the mortgage and judgment to Herman Foster. A writ of possession issued upon said judgment November 8, 1853, which was served January 30, 1854.   By request of counsel for the plaintiffs, the return is set forth in full, which is as follows:

" Hillsborough, ss.                          January 30, 1854.

  " I have caused the within named Jonathan T. P. Hunt to have full seizin and possession of the premises within described, as within commanded, by delivering the same to Herman Foster, Esquire, Attorney and Assignee.

                              " Mace Moulton, D. Sheriff."

The counsel for the plaintiffs claimed that the service of this writ was ineffectual for the purpose of a foreclosure, upon the ground that Foster was in actual possession of the property mortgaged before the date of this return, and requests that the facts bearing upon this point be reported. I find that, January 17, 1852, Fellows assigned the rents to Isaac Tompkins, who agreed to account to him for them; that Tompkins collected the rents of the whole premises owned by Fellows down to and including January 1, 1853; that from that time the rents accruing from the premises covered by the Montgomery and Lund mortgages were collected

by Hale until he assigned said mortgages to Herman Foster, and the rents accruing from the balance of the premises were collected by Tompkins down to and including December 1, 1853; that all of the rents were, in fact, collected by Foster, or by the firm of which he was a member, as attorneys, and accounted for to the parties to whom they belonged, as above stated; that Foster continued to occupy the premises always, down to his death, renting them, collecting the rents, and treating them as his own property; and there is no evidence that he ever accounted for any rents collected by him, except as above stated, or that any claims were ever made upon him for said rents. No question was made that all of said mortgages were for a valuable consideration, and that the sums purporting to be due upon them were actually due; but the plaintiffs' counsel claim that the mortgage of the Amoskeag Manufacturing Company was paid by Fellows. The referee finds that Isaac Tompkins paid to Foster, as Hale's attorney, from the rents due November 1, 1852, from the property covered by the mortgages then held by Hale, and upon one of which a writ of possession issued October 29, 1852, $142.50, the payment being made November 4, 1852; from the same source, from the rents due December 1, $150; from the rents due January 1, 1853, $150; that Foster, as Hale's attorney, collected the rents due February 1, 1853, $150.66; that February 10, 1853, a settlement was made between Foster and said Hale, in which Foster accounted to Hale for said sums by passing over to him said note and mortgage, and receiving Hale's due-bill for the balance then remaining due upon said mortgage, amounting to $61.09, which was subsequently cancelled by applying the rents collected by Foster for Hale to its payment. Receipts were given for said sums of $142.50, $150, and $150, agreeing to apply them upon the Lund mortgage, but they were never so applied. I find it probable, there being no direct evidence upon the point, that Hale forebore to have his writ of possession served as soon as obtained, upon the agreement that the rents of the premises covered by it should be paid over and applied to extinguish the mortgages upon them.

It was further proved, by record evidence, that on September 22, 1851, Fellows executed a mortgage, called at the hearing the surety mortgage, to Ira Clough, John D. Riddle, Jonas Harvey, Jr., Benjamin Mitchell, Isaac Tompkins, David Webster, Gilman Harvey, Amos G. Gale, and Reuben White, to secure each of them for endorsing certain negotiable paper described in said mortgage, at the request of said Fellows. Said mortgage covered Fellows's interest in lots 291–296 inclusive, and also the homestead of Fellows at Goffe's Falls.

Ira Clough, by deed dated March 20, 1854, assigned all his interest in said mortgage for the consideration, as expressed in the assignment, of $3,161.22. David Webster made a like assignment, under date of April 4, 1859, for the consideration of $1,000, the

debt being stated as amounting to $1,244.66, May 7, 1857, as determined by a judgment which was included; John D. Riddle, under date of February 9, 1853, for the consideration of $1,106.51; Benjamin Mitchell, under date of September 20, 1853, for the consideration of $1,033.29; Isaac Tompkins, under date of June 10, 1853, for the consideration of $2,499.52; and Gilman Harvey, under date of July 12, 1853, for the consideration of 1,207.43. The several parties named covenanted, in their several deeds of assignment, that the sums named as the consideration of said assignments were actually due them by reason of payments made by them upon said negotiable securities endorsed by them. No foreclosure of the mortgage upon the Merrimack block was ever attempted. December 16, 1865, Foster sued out a writ of entry upon the mortgage, against Fellows, to recover possession of his homestead at Goffe's Falls. December 18, 1865, Fellows acknowledged service of the writ. Fellows and Foster, by an agreement in writing, entitled as of the January term, 1866, stipulated that judgment be entered upon the writ, as of mortgage, for $17,544.05 debt, due February 14, 1866, and costs amounting to $7.20. The amount of the debt was made up by taking the amounts expressed in the several assignments as the amounts due the assignees respectively, and adding interest to the date of judgment. Possession was never taken of the premises under the judgment, and a writ of *scrire facias* was sued out by the executors thereon since the death of said Foster, which is now pending. The plaintiff denied the payment by said parties of the notes, and also the payment by Foster of the consideration of the assignments. The payment by Tompkins of the securities endorsed by him was verified by the affidavit of Tompkins and Nathan Parker, filed in the suit; and the payment of Gilman Harvey, by the affidavit of Moody Currier. Parker and Currier were called as witnesses, and testified that they had then no recollection of the payments, but that they must have known and remembered the facts stated in their respective affidavits at the time of signing them. There was no other direct evidence upon the question of the payment of the securities by the parties, aside from the judgment and the papers filed, copies of which make a part of the record thereof, except the deposition of Isaac Tompkins, who testified that he paid nothing upon the securities endorsed by him, and there was no other direct evidence as to the amount paid by Foster for the assignments.

The plaintiffs offered no evidence that Herman Foster agreed in writing with Moses Fellows to hold Merrimack block, or his legal title in any real estate acquired by him which once belonged to Fellows, in trust for the benefit of Fellows, or that he agreed to keep open the foreclosure of the mortgages and allow Fellows to redeem the same. There is not sufficient evidence to prove that there was any such verbal agreement or understanding between them, or that any part of the funds which were paid by Foster

for the mortgages assigned to him were received from Fellows or from funds which belonged to him.

Foster, on the 1st day of November, 1867, conveyed to Alonzo H. Weston all that part of lots 291 and 292 which he acquired of Fellows, with a strip adjoining from lot No. 293, two feet wide, for the sum of $2,000. The remainder of the property upon Elm street continued to be his until his death. A reference to the plan accompanying this report shows the location of the premises upon Elm street, and the lots covered by the various mortgages.

It was further proved, by record evidence, that Moses Fellows, on the 22d of September, 1851, made another mortgage to the same persons, named as grantees in the surety mortgage before described, to secure them against the same indebtedness described in the surety mortgage.

The mortgage covered all the lands owned by him in Londonderry. On the 10th day of June, 1853, Isaac Tompkins assigned all his interest in said mortgage to said Herman Foster for the consideration, as expressed in the assignment, of $2,499.52. The assignment bears the same date, and is for the same consideration, as his assignment to Foster of his interest in the surety mortgage in Hillsborough county. July 12, 1853, Gilman Harvey assigned his interest in the mortgage to Foster for the consideration of $1,207.43, as expressed in the assignment, which bore the same date and was for the same consideration as his assignment in Hillsborough county. September 5, 1853, Foster sued out a writ of entry upon the mortgage, and November 4, 1853, recovered conditional judgment for $3,788.67 debt and $6.88 costs.

A writ of possession issued June 30, 1854, which was served September 12, 1854, at which time Moses Fellows became tenant of Foster under a written lease, at a rental of fifteen dollars a month. The mortgage was described as subject to a mortgage of John Foster, dated September 22, 1851, made to secure his note of even date for $2,000, payable to John Foster in five months. September 6, 1852, a writ of entry was brought upon the mortgage, upon which conditional judgment was rendered October 12, 1852, for $2,166.67 debt and $5.28 costs. A writ of possession issued upon it, which was served December 14, 1853, and possession delivered to Herman Foster as attorney for John Foster, and on the same day Moses Fellows acknowledged by deed that he held the premises as tenant of John Foster, and agreed to pay one cent a month rent.

The plaintiffs claimed that this mortgage was without consideration, and it was conceded by the defendants, if the evidence was competent for any purpose,—which they denied,—that John Foster knew nothing of the making of the note and mortgage at the time it was made, and for a long time afterwards. There was no other evidence upon the question of the consideration of this mortgage.

June 25, 1853, Jonas Harvey, Jr., assigned all his interest in the surety mortgage in Rockingham county to John Foster for the consideration of $953.67, as expressed in the deed of assignment, in which Harvey covenanted that he had paid the note endorsed by him, and that amount was due him by reason of the payment. September 5, 1853, John Foster sued out a writ of entry upon the mortgage, and on November 4, 1853, recovered conditional judgment for $953.67 debt and $6.68 costs. A writ of possession issued upon this judgment, which was served September 12, 1854, and Herman Foster, as attorney for John Foster, put in possession. October 2, 1855, John Foster quitclaimed to Herman Foster all his interest in the lands mortgaged under the two preceding mortgages, for the consideration, as expressed in the deed, of $1,000.

A part of the premises was described as subject to a mortgage made by Moses Fellows to Ebenezer Colby, dated September 20, 1851, to secure a debt of about $1,300, and a mortgage to William Perkins, dated September 22, 1851, to secure a debt of about $1,000. No question was made that these were genuine debts. May 10, 1854, Colby assigned the mortgage to Herman Foster for the consideration of $900, and I find upon evidence aside from the deed of assignment that he paid this sum to Colby. August 28, 1854, a writ of entry was brought upon the mortgage by Herman Foster against Fellows, and November 4, 1854, a conditional judgment was rendered thereon for $1,608.03 debt and $6.08 costs. No possession was ever taken under the judgment. No claim was made by any person under the Perkins mortgage. It appeared that his debt had been paid in some way, and that the money was received through Herman Foster.

November 24, 1856, Herman Foster quitclaimed a part of the premises described in the Rockingham county mortgages to Edward Ballou for the consideration, as expressed in the deed, of $520, covenanting to warrant against any persons claiming under him or Moses Fellows. March 30, 1857, he quitclaimed other tracts to William P. Farmer and Joseph T. Goss, for the consideration, as expressed in the deed, of $5,000. These conveyances covered all the lands acquired by Foster in Rockingham county under these mortgages, except one tract of about fifty acres, which was appraised at his death, as the Londonderry farm, for $1,200. The plaintiff offered no evidence that Herman Foster ever agreed in writing to hold the lands in Londonderry in trust for the benefit of Moses Fellows, or keep open the foreclosure for him, and there is not sufficient evidence of any such verbal agreement, or that the money paid by Foster was received from Moses Fellows or from funds belonging to him.

The master finds that all of the mortgages mentioned in this report upon which judgments were obtained and writs of possession sued out and served, were legally foreclosed so far as the determination of this question depends upon any finding of the facts.

It appeared in evidence that Fellows, for some time prior to September 22, 1851, had been somewhat extensively engaged in the shoe business, was an active business man, and at that time mayor of Manchester; that on the 22d day of September, 1851, he failed in business; that he became aware that he must fail on the Saturday previous, September 20, and on that day retained Herman Foster and Isaac W. Smith, who were then in partnership, as his counsel, Foster as the senior member being his chief adviser, and that Foster, either alone or in connection with partners associated with him, was counsel for Fellows in all the business connected with his failure, and it did not appear that he ever employed any other counsel except through Foster. Foster or his firm was counsel for the plaintiff in foreclosing all of the mortgages set forth in this report, and Fellows did not employ any counsel to defend any of the foreclosure suits. The claims against Fellows were large and the suits numerous, and all of his visible property not previously sold or mortgaged was attached, and he never had any attachable property afterwards of any amount. September 22, 1851, Foster went to Boston and sold two shares in the Amoskeag Manufacturing Company, belonging to Fellows, for $1,700. Ten shares in the Manchester Bank, worth about par, were transferred on the same day to the firm of Foster & Taylor, a firm of which John Foster was one of the partners, and some time subsequently was transferred by them to Herman Foster. There was no evidence what became of the proceeds of these stocks. The stock in trade in the shoe business was sold by the attaching officer, and purchased by Isaac Tompkins for the benefit of Fellows, and the business was continued for a year and upwards, nominally by Tompkins, but really by Fellows. Notes given in the business and for accounts due Fellows were intrusted to Foster for collection from time to time. These were twenty-three in number, amounted to $10,292.13, and were dated mostly in the spring of 1853, but some in 1852, and two in the spring of 1854. A schedule of the same appears in a demand made upon the executors by Fellows, dated February 21, 1877, and which accompanies this report. The defendants produced receipts of Fellows covering all the sums collected upon these notes. It was paid over in comparatively small sums, for which Fellows gave his notes, which were surrendered at the date of the receipts. The last receipt bears date March 1, 1859.

It appeared that Foster had, during the years from 1861 to 1874 inclusive, paid Fellows money in amounts varying from $8 to $400, sometimes charged for stock and repairs on buildings, and sometimes simply as cash. The whole amounted to $4,301.51.

It appeared further, that Foster held notes against Fellows, eighteen in number, the principal of which amounted in the aggregate to $8,328.51. These notes were renewed after the death of Foster at the request of his executors, and were presented to the commissioner upon Fellows's estate after it was represented insolvent.

It further appeared, that Fellows, on the 13th day of October, 1874, executed to Foster a release under seal, in consideration of $250 paid, of all demands and actions he had against Foster; the release is set up in an amendment to the answer which was allowed by agreement. Upon request of the plaintiff, the defendants produced four other releases in the same form, bearing date, respectively, October 7, 1861, January 16, 1870, June 15, 1870, and June 27, 1874.

A copy of the release set up in the answer is herewith submitted.

The defendants offered in evidence, also, four receipts given by Fellows to Foster in the years 1869 and 1870, amounting in the aggregate to $325, for money to be used in repairing buildings belonging to Foster at Goff's Falls. The buildings referred to are those upon the homestead of Fellows, described in the surety mortgage before referred to. Upon this evidence, and other circumstances to which the attention of the referee was called, the plaintiff claimed, and asked the referee to find and report, that Fellows was, and always continued to be, under the control of Foster as his counsel, and signed any papers he prepared without examination, and relying upon Foster as his counsel, and that they would not be used by him to his detriment; that Foster was continually, and nearly down to the time of his death, paying Fellows money and taking his obligations, which he knew Fellows could not pay and had no means to pay except from the real estate; and that it must have been understood between them that Fellows was the owner, or had a large interest in that real estate, or the right to redeem the mortgages. There is no evidence in the case which throws any light upon these transactions, except what appeared as to the acts of the parties, the character and contents of the papers produced, and what appeared as to the character and conduct of the parties. It appeared from the papers and the evidence that Foster was a very exact and cautious man, and it also appeared that Fellows was acquainted with business. There was no evidence that pointed to any fraud or deception used by Foster; and the referee finds that whatever might have been the motive which induced Foster to let Fellows have money and take notes which he must have known Fellows could not pay (and this is a matter of mere conjecture), he took the notes and releases to assert on his part, and have Fellows admit, that he did not pay him money on account of any legal liability to him, and that Fellows must have signed them knowing the purpose for which they were exacted, and intending to admit that they were not paid on account of any legal liability. It appeared from Foster's books that his account for services commenced September 22, 1851, and was settled December 3, 1857, by Fellows's note of that date for $1,369.92. The account included services and cash paid out, and some items of cash lent, and the main portion of it was charged prior to January 1, 1855.

There was a small unsettled account upon his books, amounting to about $60, commencing December 30, 1857, and ending September 11, 1862. There was an entry under date of April 7, 1868, but no amount carried out against it.

The master finds, so far as it is a question of fact, that Foster's title to the real estate under the mortgages assigned to him is not affected by the fact that he was employed as counsel by Fellows.

The master was requested by counsel for the plaintiff to report facts upon a large number of specific requests. Many of the requests were designed evidently to call his attention to facts and circumstances which sustained the plaintiff's view of the relations of the parties, and the agreements claimed to exist between them, and are answered by the general finding in the report. The master was requested to enter into a calculation of the amounts due upon the Montgomery and Lund mortgages when transferred to Foster, deducting the rents.

The data are not quite definite, and the result would have no material effect in the case unless it should be decreed that the plaintiff is entitled to redeem, and he has not, for that reason, attempted such calculation. He was also requested to enter into a calculation, and report at what time the rents of the Merrimack block would have paid the mortgages and interest, but he has not done so for the reason above given; also, to find the value of the different parts of the block. There was no evidence of value except the amount of rents paid. In 1852 and 1853, the rents of that part of the block covered by the Montgomery and Lund mortgages amounted to about $150 per month; of the remainder of the block, to about $70 a month.

The master was asked to report the facts in reference to the executors' withholding the books and papers of Foster from examination. The executors were requested to produce the books and papers before the commissioner upon the presentation of their claim, but declined to do so. An attempt was made to take the deposition of Clough in this case, and he then declined to produce them on the ground that it would disclose their case. Upon the hearing before the master, they were again requested to produce them, and they produced all books and papers called for which they could find or had any knowledge of, as they declared, and the master finds no evidence which impeached or discredited their declaration upon this point. No book was produced showing the private cash transactions of Herman Foster between September 20, 1851, and March 30, 1857, and the plaintiff claimed that, from his well known habits of care and method in keeping his accounts, such book must have been kept by him. No witness was produced who ever saw such book, or knew of its existence. The master was requested to find the amount due upon the mortgage upon the homestead at Goff's Falls. The defendants claimed that the judgment conclusively determined the amount. The plaintiff

objected to the acknowledgment of service made by Fellows upon the writ, and his agreement as to the amount for which judgment should be rendered, upon the ground that there was no proof of the genuineness of his signature. The objection was overruled, upon the ground that the agreements were in part the basis of the judgment and sufficiently proved by it. The plaintiff excepted.

In addition to the facts previously reported, the master reports that no allowances were made on account of the Merrimack block, covered by this mortgage, as previously stated, or the lands in Londonderry, and makes no finding upon this point until the legal principles involved have been determined by the court. The homestead was appraised in the executors' inventory at $6,000.

It appeared that the surety mortgage upon the homestead was by its terms made subject to a mortgage to Thomas Livermore, dated September 20, 1851, to secure a debt of $5,000, as described in the mortgage. It appeared, also, that a writ was sued out upon this mortgage at the April term, 1852, a conditional judgment entered up, a writ of possession issued under which Livermore was put in possession, August 13, 1852, and that Fellows became his tenant under a written lease, at a yearly rent of $1. April 13, 1875, Livermore quitclaimed all his interest in the premises to Moses Fellows. The defendants objected to this evidence as immaterial upon any question raised in this case, and in their brief, furnished after the evidence was closed, asked leave to offer further testimony upon this matter.

The defendants objected to any parol evidence to establish any trust or other agreement on the part of Foster to affect his apparent legal title by foreclosure proceedings to the lands covered by the mortgages, and the evidence was received, subject to their exception. They also claimed that the conditional judgments rendered were conclusive evidence of the amounts due upon the mortgages upon which suits were brought, and excepted to all parol evidence received upon this point.

The deposition of Moses Fellows was taken in behalf of the plaintiff and offered in evidence. The plaintiff claimed that it was admissible, upon the ground that, before the suit was brought, the executors had settled their account as such, accepted their appointment as trustees, and the suit was against them as such, and the statute did not apply. The master ruled, that, as the suit was founded upon an alleged agreement of the testator, it was necessarily against the defendants, Foster and Clough, as executors, and the statute did apply. The plaintiff excepted. The plaintiff claimed, also, that it was admissible on the ground that Foster was his attorney. The master ruled that so much of the deposition as related to agreements or consultations between Fellows and Foster, when no other party was present who could be called as a witness, was inadmissible, either as a matter of right or discretion, to prevent injustice; but that other parts of the deposition might be

read. The plaintiff excepted. A small part of the deposition was read under this ruling. One question and answer related to a conversation with E. J. M. Hale, in which he testified in substance that Hale said, if he would find some one to take the Merrimack block for his benefit, $10,000 might remain as long as he liked. The next question offered to be read was as follows: "What, if anything, did you do next in consequence of this proposition of Mr. Hale?" The answer detailed an interview with Mr. Foster, and was excluded. Int. 17 was as follows: "After Mr. Foster began to collect the rents of the Merrimack block, when, if at all, and how often, were you upon the premises, and for what purpose, and in what character and capacity was he there?" It was excluded. The plaintiff excepted to these rulings.

After a large part of the evidence in the case had been introduced, the plaintiff asked leave to amend his bill. The defendants objected, and the master declined to consider the propriety of the amendment under his commission, and refers the same to the court. The amendment or amended bill, in substance, claimed relief upon the ground that the estate was insolvent, and the conveyances fraudulent as to creditors. It appeared that the administrator found personal estate amounting to $700 or $800 in value, and no other estate except the real estate at Goff's Falls embraced in the mortgage. The estate was administered as insolvent, and claims to the amount of $1,500 to $2,000, besides the claims made by the Foster estate, were proved. There was no evidence when these claims originated. It was not claimed that there was any further evidence upon the alleged fraudulent character of the title of Foster; and the master finds, upon the evidence before him, that the title of Foster to the real estate in Hillsborough and Rockingham counties, obtained by the foreclosures, was not fraudulent as to creditors. He suggests that the allowance of the amendment might vary the rule for determining the amount due upon the mortgage upon the homestead at Goff's Falls. The records and written instruments offered in evidence are made a part of this report, for the purpose of reference, so far as they may be material in determining any questions of law arising upon this report.

Copy of release:

"Know all men by these presents, that I, Moses Fellows, of Manchester, in the county of Hillsborough and state of New Hampshire, in consideration of two hundred and fifty dollars to me paid by Herman Foster of said Manchester, the receipt whereof I do hereby acknowledge, have remised, released, and forever quitclaimed for me, my heirs, executors, and administrators, and by these presents do remise, release, and forever quitclaim unto said Foster, his heirs, executors, and administrators, all and all manner of actions, cause and causes of actions, suits, bills, bonds, writings, obligations,

debts, deeds, duties, reckonings, accounts, sum and sums of money, judgments, executions, extents, quarrels, controversies, trespasses, damages, and demands whatsoever, both at law and in equity, or otherwise howsoever, which against him, the said Foster, I ever had, now have, or which my heirs, executors, or administrators can, shall, or may have, claim, challenge, or demand for or by reason or reasons or means of any act, matter, cause or thing from the beginning of the world to the day of the date of these presents.

"In witness whereof I have hereto set my hand and seal the thirteenth day of October, A. D. 1874.

"Signed, sealed, and delivered
in presence of                    (Signed)          Moses Fellows.   (seal)
    L. B. Clough,
    F. R. French."

Upon the coming in of the report, the defendants moved for judgment establishing the foreclosures reported by the master. The plaintiff resisted the motion upon grounds appearing on the face of the report, and moved to set it aside because of erroneous rulings of the master, and because of his refusing, or omitting, to find material facts agreeably to the plaintiff's written request. In support of his motion the plaintiff also made specific objections to the exclusion of Fellows's deposition; to the conclusion of the master that the city mortgage was foreclosed, and that there had been a foreclosure of the Hale, or Montgomery, mortgage; to the declination of the master to find the amount due upon the mortgages assigned by Hale, or upon the city mortgages, or the value of the property covered by them respectively, or at what times at the then rentals these incumbrances would be paid off; and because the master declines to make any finding of how much, if anything, is due on the Ira Clough mortgage, "until the legal principles involved have been determined by the court."

*C. R. Morrison* (*B. P. Cilley* with him), for the plaintiff. I. The report finds that the deposition of Moses Fellows was claimed to be admissible, "upon the ground that, before the suit was brought, the executors had settled their account as such, accepted their appointment as trustees, and the suit was against them as such, and the statute (G. L., c. 228, s. 16) did not apply." To be exact, the bill was filed November 3, 1877; the executors' account was settled February 27, 1877, and Clough and Foster accepted their appointment, and gave bonds as trustees February 28, 1877. "The master ruled that as the suit was founded upon an alleged agreement of the testator, it was necessarily against the defendants as executors, and the statute did apply. The plaintiff excepted." The master's conclusion was not warranted by his premises, and a more obvious *non sequitur* could hardly be conceived of. It is just as true of each of the thirty-one defendants as of Clough and Foster, that the suit is founded upon an alleged agreement of the testator; and surely they are not

all sued as executors. The same would be true in a writ of entry brought against any heir or devisee. The fact that proof of an agreement with the testator may be necessary to repel a foreclosure, whatever may be the form of the suit or whoever the defendants, in no way determines the capacity in which they are sued.

But aside from the illogical reasoning of the master, his exclusion of the deposition was unwarrantable upon any sound reasoning. The testator, after certain specific legacies and a bequest of his homestead to his wife, gave the whole remainder of his large estate to trustees. The devise to the trustees was not to them as executors (although they were in a subsequent part of the will appointed executors), but personally. The language of the will is,—
" I give, bequeath, and devise unto my brother, John Foster, of etc., and Lucien B. Clough, and the survivor of them, their and his executors, administrators, and assigns, all the rest, residue, and remainder of my estate, real, personal, and mixed, wherever situated or however described, to have and to hold during the natural life of," etc. The report finds that the Merrimack block came into the possession of Clough and Foster as trustees, with other property. There were four mortgages upon this block, or parts of it, which the defendants claim have been foreclosed. These mortgages were not given to the testator, but to other parties, and were assigned to him after judgments as of mortgage. There was another mortgage of which no foreclosure is claimed. This was subject to all the others, and it also embraced property at Goff's Falls and in that vicinity. The bill alleges that neither of the mortgages was foreclosed, that nothing is due upon either ; but if anything is due, offers to pay the same. It prays for an account, for a decree of discharge, for deeds of release by all the defendants, and for an injunction against them all. In short, it was filed under the statute (G. L., c. 208, s. 3, and c. 136, ss. 5–10) by the mortgagor against the defendants as mortgagees. Now, after the acceptance of the trust estate by Clough and Foster, and the giving of their bonds as trustees, the executors were not mortgagees. The life estate of Clough and Foster, as trustees, was as absolute as if other persons than themselves had been appointed executors, or as would be the estate of John Foster as an heir, if no executor had been appointed or will made. Instead of the suit being necessarily against Clough and Foster as executors, it is necessarily against them as trustees. They hold only in that capacity. They have no defence to this bill or to the writ of entry, except in that capacity. If anything should be paid them in this suit to redeem the mortgages, they will hold the money only in that capacity. They will not hold it as executors, and the sureties upon their bond as executors will be in no way responsible for it. Hence, the conclusion must be, that section 16 does not apply, and there is nothing to take the deposition out of the sweeping language of section 13, that " No person shall be excused or excluded from testifying or giving

his deposition in any civil cause by reason of his interest therein as a party or otherwise." *Gregg* v. *Currier*, 36 N. H. 200–203; *Leavitt* v. *Wooster*, 14 N. H. 551–556; *Gookin* v. *True*, 3 N. H. 288; *Lucy* v. *Lucy*, 55 N. H. 9; *Weir* v. *People*, 78 Ill. 192; Perry Tr., *s.* 262, *p.* 334—cases cited in *n.* 4.

Being in possession only as trustees, a writ of entry against them "as executors" would be abatable, unless those words could be regarded as surplusage. The writ of entry against them must proceed upon the ground that there is nothing due. Hence, as there is no money coming to them in that suit, there is not a shadow of a pretence that that suit is against them as executors. If in the bill in equity any money which might be paid to them to redeem would be held by them as executors, they would be necessary parties, since, on a petition to redeem, the party entitled to the mortgage money must be brought before the court. *Palmer* v. *Carlisle*, 1 Sim. & S. 425. But, as has been shown, any such money would be held by them as devisees, and therefore as executors they are not necessary parties. There is no more occcasion to make executors, after a devise to trustees who accept the trust, parties, than to make an assignor, after an absolute assignment, a party, or than there is to make any stranger, destitute of all interest, a party. *Chambers* v. *Goldwin*, 9 Ves. 268, 269; *Bishop of Winchester* v. *Beavor*, 3 Ves. 315, 316; Sto. Eq. Pl., *ss.* 183, 189, 192, 197; *Hill* v. *Adams*, 2 Atk. 39; *Whitney* v. *M'Kinney*, 7 Johns. Ch. 144; Dan. Ch. Prac. 302, 307; *Call* v. *Leisner*, 23 Me. 25; *Beals* v. *Cobb*, 51 Me. 348; *Williams* v. *Smith*, 49 Me. 564.

In this view it is necessary to consider whether the deposition of a party is admissible under the sixteenth section, where not "the party" but a part only of several defendants are sued as executors or administrators—as to which see *Doody* v. *Pierce*, 9 Allen 141, 144; *Goss* v. *Austin*, 11 Allen 525; *Hayward* v. *French*, 12 Gray 459; *Worthley* v. *Hammond*, 13 Bush 510; *Fulkerson* v. *Thornton*, 68 Mo. 468; *Coryell* v. *Stone*, 62 Ind. 307. The mere fact that Clough and Foster, holding the entire property during the life of Mrs. Foster, were also executors, is nothing to the purpose. " It is only when an executor is party as an executor representing the estate, that the other party is disqualified from testifying." *Hamilton* v. *Hamilton*, 10 R. I. 538, 540. And where an administrator had taken an assignment of a mortgage to himself as administrator, in a suit by him to foreclose the mortgage, it was held that the defendant might testify although the plaintiff in the suit was described as administrator, since he might have sued in his own name. *Roberts* v. *Pierce*, 79 Ill. 378.

The defendant agreed with the plaintiff to work on the same terms he had worked for her husband. *Held*, in an action in her individual capacity, that the defendant might testify as to the original agreement with her husband, notwithstanding she was also executrix of her husband. *Titus* v. *O'Connor*, 57 How. 391. The gen-

eral rule is that stated in section 13, that a party may testify. The exception is in section 16, that "neither party shall testify in a cause when the adverse party is an executor, or administor, or an insane person, unless" etc. Admission is the rule and exclusion, the exception. While there is considerable diversity in the statutes of the several states as to the persons in whose favor evidence of a surviving party shall be excluded, there is, so far as we have noticed, an entire agreement that the exclusion shall not be extended by construction, but be confined to the persons or classes enumerated. *Crawford* v. *Robie*, 42 N. H. 162; *Guery* v. *Kinsler*, 3 S. C. 423–427, and cases cited; *Severn* v. *Bank*, 18 Hun 228; *Theall* v. *Steitz*, 6 Daly 482; *Bradley* v. *Patton*, 51 Ala. 108; *Ins. Co.* v. *Sledge*, 62 Ala. 566; *Hammond* v. *Drew*, 61 Ga. 189; *Hight* v. *Sackett*, 34 N. Y. 447; *McCray* v. *McCray*, 12 Abb. Pr. 1; *Wildey* v. *Whitney*, 25 How. Pr. 75; *Traphagen* v. *Traphagen*, 40 Barb. 537; *Cary* v. *White*, 59 N. Y. 336–339, and cases cited; *Roberts* v. *Pierce*, 79 Ill. 378; *Carlton* v. *Mays*, 8 W. Va. 245; *Dahoney* v. *Hall*, 20 Ind. 264; *Bragg* v. *Clark*, 50 Ala. 363; *Hodgson* v. *Jeffreys* 52 Ind. 334; *Tracy* v. *Kelley*, 52 Ind. 535; *McDonald* v. *McDonald*, 24 Ind. 68; *Elliott* v. *Shaw*, 32 Ohio St. 431; *Crane* v. *Gloster*, 13 Nev. 279; *Sedgwick* v. *Sedgwick*, 52 Cal. 336; *In re McCausland's Estate*, 52 Cal. 568.

The legislature has not seen fit to carry the exclusion beyond the personal representatives of deceased, and guardians of insane, persons. Upon all the authorities and the settled rules of construction, the court must stop where the legislature has stopped, and it cannot extend the exclusion so as to include an heir or devisee. In *Crawford* v. *Robie* the court said that the term "executor or administrator" could not be made to include the guardian of an insane person, although it was urged that such a case was within the reason of the exception in the statutes. And in several cases which we have cited, the precise holding was that these terms, as also the term "personal representatives," could not be applied to an heir, or devisee, or surviving partner.

The defendants' counsel urges that the case comes within the spirit and reason of the exclusion. The answer to this is, that there is no ambiguity in the language of the exception, and the spirit and reason of the law, there being no ambiguity, are to be found only in the law itself. There is no doubt what is meant by "executor or administrator." There is no doubt that it does not include an heir or devisee as such. The rule of interpretation has already been settled in *Crawford* v. *Robie*, decided before the statute exclusion in favor of an insane person. The opinion says,— "Though the court have been referred to many authorities to the position (Bac. Ab., stat. 1, 5), that a thing within the intention is as much within the statute as if it were within the.letter,—and it is argued that the reason of the exception of these statutes applies as strongly in the case of a party rendered incompetent to testify

by insanity, as in the case of an administrator,—yet they are of opinion that it is expedient to introduce, by their decision, any new exception to the simple and plain rule of the statute.   If evil is found to follow from the law in its present form, it will be for the legislature to provide a remedy."   This decision was made in 1860 —twenty-two years ago.   And although the legislature, after this decision, extended the exception to insane persons, they have not seen fit to extend it to devisees or heirs, although two revisions have occurred since.   It then being the law of this state, sanctioned by two revisions since *Crawford* v. *Robie*, that the court will not engraft upon the statute exceptions not made by it (the language used being wholly unambiguous), it is but little consequence what other courts may have thought.   But, in fact, the current of decision is the same way,—that the court will not add to the exclusions specified in the statute.

We submit that it is better to administer the law as the legislature has made it.   There is no certainty that justice would be promoted by extending the exclusion to heirs, devisees, legatees, and persons claiming under them.   It is enough for us that this is a question for the legislature and not for the court, there being no possible uncertainty or ambiguity in the terms of exclusion in the statute.

The error in rejecting this deposition affects the whole finding.

II. The report also shows that the deposition was offered because of the special relation, for the prevention of injustice, but was rejected, and the plaintiff excepted.

III. Upon facts reported, and other undisputed facts asked to be reported, the city mortgage was not foreclosed.

(1) Because at the date of the sheriff's return, Hunt, who recovered the judgment, had no interest, and an entry by Foster was not an entry under process of law.   The judgment was recovered by Hunt, May 8, 1852. April 9, 1853, he assigned it to Tompkins, and May 13, 1853, Tompkins assigned it to Foster.   November 5, 1853, six months after Hunt had ceased to have any interest as mortgagee, a writ of possession was taken out in his name, upon which the sheriff, January 29, 1854, returned that he had caused "the within named Jonathan T. P. Hunt to have full seizin and possession of the premises within described, as within commanded, by delivering the same to Herman Foster, Esq., attorney and assignee."   As an entry by Hunt, he having ceased to be mortgagee, this act was wholly nugatory for any purpose of foreclosure.   *Call* v. *Leisner*, *supra.*   The sheriff had no authority to put anybody in possession but Hunt.   A delivery of possession to Foster as Hunt's attorney was only a delivery to Hunt, which was inoperative for a foreclosure, since he had parted with his title.   A delivery to Foster, as assignee, was not by virtue of the writ of possession, nor was any entry thus acquired by Foster an entry under process of law.   Hence there was no foreclosure, there having

been no publication. It would have been otherwise if the assignment had been subsequent to Hunt's entry. However it may be in other states, in this state there is an essential difference between prior and subsequent deeds or assignments. Hunt never having entered under his mortgage title, his whole title as mortgagee passed by transfer of the debt and assignment of the judgment. *Rigney* v. *Lovejoy*, 13 N. H. 247; Mor. Dig. 477, ss. 91–100. The fact that he had recovered judgment as mortgagee did not change his interest. This precise point was settled in *Glass* v. *Ellison*, 9 N. H. 69. There the mortgagee had recovered judgment and taken out a writ of possession. But the writ of possession not having been executed, it was held that the mortgagee had no interest in the land that could be taken by an extent. Any entry, therefore, by Foster was an entry upon his own title as mortgagee, and not under Hunt's title, or under the writ, which only authorized a delivery to Hunt. There is an essential distinction between the effects of an assignment of a judgment upon which land is afterwards set off on execution, and an assignment of a mortgagee's judgment, so far as it relates to his interest as mortgagee. In the one case the assignee gets only an equitable title; in the other case he gets a legal title, and holds in his own right as mortgagee. Very different questions might arise between Fellows and Foster, taking his title two years after the judgment, than between Fellows and Hunt. Whether there would or not, Foster held in his own right as mortgagee, and his entry was only *in pias*, and not under process of law.

(2) Because the report shows that, at the date of the officer's return, Foster was already in peaceable possession of the premises covered by the city mortgage, taking the rents. The officer's return added nothing to the possession, which had then been held for two months. *Riddle* v. *George*, 58 N. H. 25, and cases cited.

(3) Because of the relation of attorney and client in respect to this parcel. The report finds that this mortgage was made out by the firm, in which Foster was the senior member and the one principally trusted, in anticipation of Fellows's failure; that Fellows retained the firm. The firm was dissolved soon after, and the senior member continued to act as Fellows's counsel; and he never had any other counsel, except as employed through Foster, down to Foster's death. Down to December 3, 1857, the amount charged for professional services was $1,369.32.

The report also finds that "Foster was, or his firm were, counsel for the plaintiff in foreclosing all of the mortgages set forth in this report, and Fellows did not employ any counsel to defend any of the foreclosure suits." Foster could not hold an assignment taken under such circumstances, at his client's expense, adversely to his client, or for any other purpose than reimbursement. The relation cannot be prostituted to such base personal ends as Foster, or his executors, would put it to, by which property

worth $10,000 at the time was to be foreclosed on a debt of $3,000, and the client, in addition, to pay $3,000 to release an attachment upon it.    As Foster is made to have intended, if a foreclosure is. sustained, the business of a highwayman is respectable in compari-- son with the robery of his client.    It should be presumed that Foster intended to act honestly, and as holding only for reimbursement. *Smith* v. *Brotherline*, 62 Pa. St. 461; *Moore* v. *Bracken*, 27 Ill. 23; *Pearson* v. *Benson*, 28 Beav. 598; *Morgan* v. *Higgins*, 5 Jur.. N. S. 236; *Stockton* v. *Ford*, 11 How. 232; *Henry* v. *Raiman*, 25 Pa. St. 354; *Baker* v. *Humphrey*, 101 U. S. 494; *Galbraith* v. *Elder*, 8 Watts 81; *Williamson* v. *Moriarty*, 19 Weekly Law Reg. 118; Perry Tr., *ss.* 212, 303, and cases cited; 1 Sto. Eq. Jur.,. *ss.* 310,. 311, and cases cited; Waite Act. & Def. 246, 462, 466, and cases cited; *Rogers* v. *Marshall*, 14 C. L. J. 186–173, and cases. cited.    Nor is the result changed by the releases put in evidence, of October 7, 1861, January 16, 1870, June 15, 1870, June 27,. 1874, and October 13, 1874,—five of them.    A release of "all' causes of action" from the beginning of the world until now is not a transfer of real estate.    Why was there not a quit claim deed?    The relation of attorney and client, and its inevitable con- trolling effect, had not ceased.    The master's finding that there was no evidence of fraud, and that Fellows must have understood he was admitting that the trifling sums paid were not paid on ac- count of any legal liability, comes wholly short of what is neces-- sary to uphold the release as transferring fifty thousand dollars'' worth of property.    The gross inadequacy of consideration is de-- cisive of itself.

IV.    For like reason there is no foreclosure of the Montgomery or Hale mortgages.

V.    The master declined to find how much was due upon the- mortgages assigned by Hale, or upon the city mortgages, or the- value of the property covered by them respectively, or at what. times, at the then rentals, these incumbrances would be paid off. These facts are material.    They are especially important in view of the relation of attorney and client, and of the releases which are- set up.

VI.    The master makes no finding how much, if anything, is due upon the Ira Clough mortgage, "until the legal principles in- volved have been determined by the court."    The bill says nothing of any judgments upon this mortgage.    They are set up in the an- swer, and with others,—one by agreement between Foster and his. client for no less than $17,544.05.    Although the defendants had amended their answer, the master refused an amendment to the bill impeaching this judgment as fraudulent against creditors.    He refers the application to the court.    He suggests "that the allow-- ance of the amendment might vary the rule for determining the amount due upon this mortgage."    If the cause should be sent to. another master upon this point, we should hope that some of the-

erroneous statements of fact and evidence in relation to this mortgage, as well as others, may be corrected. However, upon the report as it now stands, we say,—

(1) Clark, coming in as administrator of an insolvent estate to prosecute this suit and defend the *scire facias*, represents creditors.

(2) Foster can be allowed no more than what he actually paid, and for which he has not been reimbursed.

(3) The burden of proof is upon him to show, affirmatively, independently of the judgment, that the sum for which he induced his client to sign an agreement for judgment was justly due.

VII. The report should be set aside as against evidence, as well as because of the exclusion of the deposition of Fellows, and erroneous rulings, and because of the great mass of property, other than that covered by these mortgages, that went into Foster's hands and which is not satisfactorily accounted for.

*Jeremiah Smith* and *William M. Chase* (*L. B. Clough* with them), for the defendants. The plaintiff's case labors under insuperable difficulties; he seeks to entitle himself, by oral testimony, to redeem a mortgage after more than twenty years' possession by the mortgagee under a judgment; he makes this attempt in the face of his own release of all demands and causes of action, which he gave to the mortgagee in possession; he proposes to accomplish his purpose by introducing his own testimony, after the mortgagee's lips have been sealed by death. If the plaintiff can succeed in this case, there is no longer any security for titles in New Hampshire.

The deposition of the plaintiff, Fellows, was inadmissible. "Neither party shall testify in a cause where the adverse party is an executor or administrator. . . . . . ." G. L., *c.* 228, *s.* 16. This statute applies to suits in equity as well as at law. *Robinson* v. *Wheeler*, 51 N. H. 384, 387; *Brown* v. *Brown*, 48 N. H. 90. The statute does not require that an executor should be the sole adverse party. Such a construction would render it practically inoperative in a large proportion of equity suits. The cases cited in the plaintiff's brief, are all (with possibly one exception) cases where the original contracting party consisted of two or more partners or joint contractors, only one of whom had deceased. The death of one of two joint contractors was not regarded as equivalent to the death of a sole contracting party, there being a survivor left to confront the adverse party. See the opinion in *Fulkerson* v. *Thornton*, 68 Mo. 468. But in the present case the sole original contracting party has deceased, and the reason for exclusion applies just as fully as when all the members of a copartnership have deceased. Upon this branch of the case we take three positions:

1. The executors of Herman Foster are necessary parties to this suit.

2. Even if the interest of the estate in these mortgage securities is regarded as having now passed from the executors to the trustees, the statutory protection passes with the property as an incident, and continues to exist in favor of the trustees claiming by transfer from or under the executors.

3. The trustees can claim the protection of the statute, irrespective of the fact that the property came to them through the executors. The terms " executor or administrator," as used in the statute, are intended to include all persons holding, in a representative capacity, property derived from a deceased person.

The executors of Herman Foster are necessary parties to this suit. If Clough and Foster are not to be considered as parties in their capacity of executors, then the plaintiff has not brought the proper parties before the court, and he must fail for that reason.

In a bill to redeem a mortgage, the personal representative of the mortgagee must be made a party. 1 Dan. Ch. 282, 3d Am. ed.; Sto. Eq. Pl., *s.* 188 ; 2 Jones Mort., *s.* 1100, 2d ed. Indeed, it has been held that he is the only necessary party. *Copeland* v. *Yoakum*, 38 Mo. 349. The same result would follow if the situation of the parties were reversed, and this were a bill to foreclose instead of a bill to redeem. The personal representative is the proper party to bring suit to foreclose a mortgage. 2 Jones Mort., *s.* 1388, 2d ed.; *Buck* v. *Fischer*, 2 Col. 182; *Dayton* v. *Dayton*, 7 Bradw. 136; *Bickford* v. *Daniels*, 2 N. H. 71; *Woodruff* v. *Mutschler*, 34 N. J. Eq. 33, 36 *n.*;—see, also, *Fifield* v. *Sperry*, 20 N. H. 338. A sole devisee and legatee, who is also sole executor, cannot, as devisee and legatee, maintain a bill to foreclose. *Buck* v. *Fischer, supra.*

The real foundation of this suit is an alleged agreement of the testator. This agreement cannot be established and enforced in a suit to which his personal representatives are not parties. The executors are the parties to whom the money is to be paid. Their discharge or receipt is requisite. " They are the parties not only who receive, but who are to settle or to contest, as the case may be, the amount to be paid " by the mortgagor. " No one else can legally adjust the amount to be paid, or acquit for the payment." The bill prays, *inter alia*, " that the defendants may come to a just accounting with him of all the moneys, rents, and property aforesaid, and that said court may determine what, if anything, is due upon said mortgages, or either of them, deducting all rents and profits, money and property, received on account of the same . . and that said court may order a decree of discharge of said mortgages, and each of them . . ."

Clough and Foster, by accepting their appointment as trustees, did not cease to be executors. Suppose the situation of the parties reversed, Fellows in possession, and a foreclosure suit necessary: would not the executors be the proper parties to bring that suit, or a suit upon the notes ? Undoubtedly the executors would not

be entitled to the beneficial enjoyment of any property realized by that suit. But this is always the case. An executor, as executor, is never entitled to the beneficial enjoyment of debts due the estate ; yet he is the only proper party to collect such debts. Both at law and in equity, the whole personal estate of the deceased vests in the executor. He alone can represent the personalty. 1 Will. Ex., 718, and *n.* d² 6th Am. ed. Whenever the personal assets of a deceased person may be affected by the decree, his personal representative must be a party to the suit. 3 Will. Ex. 2,178 (bottom paging, 2016, 2017). If the executors are necessary parties to a suit brought to determine whether any part (and, if so, how much) of that debt remains unpaid, " the right of the plaintiff in this suit to testify ought not to be made to depend on the incidental circumstance of the one party or the other being plaintiff in the suit, when the matter in issue, and the parties are the same, and the effect of the judgment the same upon the estate of the deceased." See *Peck*, J., in *Fitzsimmons* v. *Southwick*, 38 Vt. 509, 575.

If a person indebted to the estate of Herman Foster should now voluntarily make payment to Clough and Foster, it may be assumed, for the sake of argument, that it would be the duty of the executors to hand the money (when received) over to themselves as trustees, and it might perhaps be presumed, as against the trustees and their sureties, that this was done. But this is a very different thing from saying that the trustees could have compelled the payment of the money, except through the medium of the executors. Because the money when collected will go to the trustees, it does not follow that the trustees can maintain an action against the debtor if he refuses to pay. Neither the sole legatee in a testate estate, nor the next of kin in an intestate estate, can maintain suit to recover the personal property of the deceased. The suit must be brought by the executor or administrator.

The plaintiff refers to cases where the heirs have attempted to settle and divide among themselves, without the appointment of an administrator; and he cites *Babbitt* v. *Bowen*, 32 Vt. 437, where the heir to whom a note and mortgage fell upon such a division was allowed to maintain a petition for foreclosure. But this decision, even if correct, is not in point. In the present case, no attempt was made to settle without taking out administration ; and we are not called upon to consider what remedies the heirs or devisees might have had if no administration had been taken out. Here, executors were appointed, and cannot now be divested of their authority by any supposition as to what might have been done if they had not been appointed. Where there is a duly appointed executor or administrator, the heirs and devisees cannot usurp the office, or be allowed to perform the functions legally incumbent thereon.

It may further be remarked, that the New Hampshire decisions, as to settlements and divisions out of court, have not gone to the

extent of holding that the heirs who thus settle can maintain actions in their own names to collect debts or enforce mortgages. The principle adopted is, that, when the heirs have agreed, the courts will enforce those agreements as between the heirs themselves ; and that an administrator subsequently appointed upon the petition of an heir stands no better than the heir himself. But it has not been held that an agreement of the heirs binds a debtor of the estate who has not assented to it. The heirs, even after the debts of the estate are all paid, cannot foreclose a mortgage without the intervention of an administrator. *Haskins* v. *Hawkes*, 108 Mass. 379.

An attempt is made to show that legatees stand better than heirs, and may foreclose mortgages without the intervention of executors. But the case relied on by the plaintiff (*Proctor* v. *Robinson*, 35. Mich. 284) was a case of a *specific* legacy of a mortgage. (The opinion in that case is misquoted in the plaintiff's brief. Where the brief says " legatee," the reported opinion says " specific legatee.") In the present case there is no specific legacy of the Fellows notes or mortgages. The interest of the trustees and the beneficiaries in this part of the estate arises solely under the residuary clause ; and that interest can be made available only through the executors, and can be enforced only by suit in the name of the executors.

The plaintiff claims that the notes are still uncollected and the mortgages still unforeclosed ; and, viewing the property from this standpoint, he argues that the settlement by Clough and Foster of their account as executors, and the filing of their bond as trustees, operated *ipso facto* to transfer from the executors to the trustees all interest in outstanding notes and mortgages.

This argument is unsound. Clough and Foster are still executors. The executors have never made, nor been ordered to make, any transfer of the Fellows notes and mortgages to themselves as trustees. The account settled by the executors did not include the Fellows notes (to which notes the mortgages, if viewed as still unforeclosed, are mere incidental accompaniments). Assume, if you please, that the judge of probate decreed that the executors were chargeable for the balance appearing due upon the account ; or, that the judge went further, and decreed that the executors must pay over that balance to themselves as trustees : now, can that decree affect anything except the title to that cash balance ? can it affect matters not embraced in the items of the account then before the court ? can an accounting for collected debts operate as a transfer of uncollected debts ? If a settlement of an administration account operates *proprio vigore* to transfer uncollected demands to the heirs, why did the legislature take the trouble to enact that the judge of probate may, by special order, require the administrator to make such a transfer ? See G. L., *c.* 196, *s.* 7.

If, however, it shall be held that the executors are not necessary parties, the plaintiff's deposition must still be excluded. Even if the property is regarded as having passed from Clough and Foster, executors, to Clough and Foster, trustees, the testimony of Fellows is not hereby rendered admissible.

The plaintiff asks the court to put a bounty on delay. He asks them to hold that he has gained an advantage by delaying after the testator's death to commence this proceeding until more than two years had elapsed. Herman Foster died February 17, 1875. Clough and Foster filed their account as executors February 27,. 1877, and on the following day filed their bond as trustees. This suit was begun November, 3, 1877. The plaintiff's argument amounts to this : We virtually admit, that if this proceeding had been commenced at any time between Herman Foster's death and February 27, 1877, the executors must have been made parties, and the deposition would have been inadmissible. But by delaying to begin proceedings until after settlement by executors and giving bond by trustees, we have entitled ourselves to the advantage of using the deposition in evidence.

Shall the statute receive such a construction as will place it within the power of a surviving party, in cases like the present, to make his own testimony admissible, by his own election to delay the commencement of proceedings ?

It is virtually conceded (see report and plaintiff's brief) that if this proceeding had been brought at any time within two years after Foster's death Fellows would have been incompetent to testify. Then, how was his incompetency restored ? The law, which rendered him incompetent, has not been altered or repealed. The transfer (of the interest in the notes and mortgages) from Clough and Foster, executors, to Clough and Foster, trustees for devisees, does not restore the competency of a witness who would have been incompetent in a controvorsy with the executors. If the contrary is held, then the statute (excluding the testimony of a surviving party in suits with the executors) ought to be entitled, An act to delay the settlements of estates. For if the protection is understood to continue only while the estate is in process of settlement, no estate will be settled until all prospective adverse claimants have deceased. ·

If the property while in the hands of the executors was protected from this testimony, the transfer of the property from the executors to the trustees did not have the effect of withdrawing the statutory protection. The protection would have passed with the property to the transferees of the executors, even if those transferees had been entire strangers. *A fortiori*, the protection passes when the transferees are persons taking in a fiduciary capacity as representatives of the legatees of the testator.

Is a defence available against an assignee which was not available against an assignor ? An assignee is clothed with the rights

of his assignor. "*Assignatus utitur jure auctoris.*" As a general rule the assignee of property takes it " clothed with all the rights which attached to it in the hands of the assignor." Ordinarily the capacity of the assignor to transfer to another is exactly measured by his own rights. The assignee takes all the rights the assignor parts with, and stands, generally, " in exactly the same situation as the assignor." Sometimes, indeed, he stands much better than the assignor; but it is enough for present purposes that he does not stand worse. " That which is assigned takes with it for its use the rights of the assignor." The assignee of a chattel, or property, or right " has all the rights incident to such chattel, or property, or right, which the assignor had at the time of the assignment." " The general rule, that a purchaser is entitled to all the remedies of the seller for the recovery or protection of the thing bought," applies " with full force to the sale or assignment of a chose in action." 3 Lead. Cas. Eq., 3d Am. ed., 369.

When any person is entitled to hold property freed from a certain defence, he is equally entitled to convey it freed from that defence. Otherwise he " must be forced to keep the estate, and cannot sell it." He " would not enjoy the full benefit of his own unexceptionable title. Indeed, he would be deprived of the marketable value of such a title." The right to hold would be imperfect if it did not involve the right, also, of conveying the property in the same condition in which he held it. It is well settled that a purchaser with notice, from a purchaser without notice, is " considered to be in the same situation and is entitled to the same protection as his vendor." See authorities cited in *Piper* v. *Hilliard*, 52 N. H. 209, 211; *Bell* v. *Twilight*, 18 N. H. 159, 165, 166; *Hascall* v. *Whitmore*, 19 Me. 102.

The foregoing common-law doctrines are to be taken into account in determining the effect of the statute. Bish. Wr. L., *ss.* 118 *a*, 88, 134, 136. Statutes take their qualities and incidents from the common law. ". . . whatever is newly created by statute draws to itself the same qualities and incidents as if it had existed at the common law." *Ib.*, *s.* 139. " The common law, as prevailing at the time when a statute is passed, is as much to be taken into the account in the construction of the latter, as is a prior enactment." ". . . when the harmony of the legal system requires, statutes will be construed as extended in their effects by the common law beyond their terms." " Rights and duties newly created by statute are, in the same way, construed as extended by the common law, . . . interpretation adding the common-law rule to the statutory terms."

It is held that a laborer's statutory lien inures to the benefit of the purchaser of the laborer's claim, and is enforceable by such purchaser. *Murphy* v. *Adams*, 71 Me. 113—*S. C.*, 36 Am. Rep. 299; *Tuttle* v. *Howe*, 14 Minn. 150; *Kerr* v. *Moore*, 54 Miss. 286; *Iaege* v. *Bossieux*, 15 Grat. 83; *Skyrme* v. *Occidental Mill*, 8 Nev.

219; *Rogers* v. *Omaha Hotel Co.*, 4 Neb. 54; *Mason* v. *Germaine,* 1 Mont. 263. So it has been held that, where a debt for the purchase-money is excepted from the operation of the homestead exemption act, this privilege or lien follows the debt into the hands of an assignee. *Chambliss* v. *Phelps*, 39 Ga. 386; *Dillon* v. *Byrne*, 5 Cal. 455. And the assignment of a judgment against a corporation carries with it the claim on which it was founded, and all rights and remedies for the collection of such claim, including the statutory remedy against the trustees under the personal liability act. *Bolen* v. *Crosby*, 49 N. Y. 183, 187. To say that the right of exclusion is not a " vested right," in the constitutional sense, is entirely beside the present inquiry. It certainly is an existing right, and one which materially enhances the value of property. So long as the statute remains in force, there is no reason why this right of exclusion shall not accompany the property, like any other existing right. Are the defendants to be denied any present benefit from an existing statute, for the reason that they possibly may not be able to derive any benefit from it at some future time? Is the court asked to repeal the statute now, because the legislature has the power to repeal it by and by? The moment the notes passed into the hands of the executors, the maker's right to testify ceased. Once ceasing, it never revived. The executors, having a perfect title, can transfer a perfect title. The executors held, free from any danger of attack by the testimony of Fellows. The power of transferring the property to others with the same immunity is incident to their ownership.

Thus far the question has been discussed as though the executor were the beneficial owner of the property of the estate, and the statute protection designed primarily for his benefit. But the real state of the case is infinitely more favorable to the defendants. The executor, as such, is not beneficially interested in the property. He is merely the representative of the interested parties. He is a mere trustee for the beneficiaries. The statute was passed, not for the personal benefit of the executor, but for the benefit of those whom he represents. Does the protection given to the property for the sake of the beneficiary continue only while the property is in the hands of the trustee, and cease the moment the property comes into the hands of the beneficiary himself? Is the agent protected for the sake of his principal, and yet the principal unprotected? Shall a statute whose object is equality be so construed as to promote inequality?

The same legislature that first used the phrase here in question enacted other statutes whose beneficial operation would be practically nullified by adopting the plaintiff's construction of this act. The expression " where the adverse party is an executor or administrator " is first used in the witness act of 1857, *c.* 1952. Another act of the same legislature, approved the same day as the witness act, provides as follows: " Whenever there shall be bonds, stocks,

or other written evidences of debt, in the hands of an administrator of a solvent estate, and there are minor heirs, and it shall appear to the judge of probate    .    .    .    that it would be for the interest of such minor heir that such property should not be sold by the administrator, but be transferred to the heirs, the judge of probate may order such bonds, stocks, or other written evidences of debt to be transferred to the heirs or the guardians of the heirs respectively in their fair and just proportions    .    .    ." P. L. 1857, c. 1963, s. 1; reënacted, leaving out "minor," in G. L., c. 196, s. 7. Section 3 of the same chapter, 1963, laws of 1857, recognizes also the executor's power to dispose of securities, and facilitates the exercise of that power. The obvious purpose of the legislature in authorizing an assignment of uncollected claims to the guardians of minor heirs was, to save the estate from the expense or delay of keeping it in court; and this commendable object would be completely defeated if such assignment would restore the competency of persons as witnesses against whom the claims were assigned. The settlement of estates would be indefinitely prolonged. What heir or legatee would wish to take an assignment of the claims, " if it opened the door to defences that would not exist if the estate was represented by an administrator or executor "? Clearly the legislature must have understood that the assignment of an uncollected claim " will not restore the competency of witnesses who would have been incompetent if the action had been brought by an administrator or executor."

*Peacock* v. *Albin*, 39 Ind. 25, was an action on a note made by Albin payable to Keen, and assigned by Keen's executor to the plaintiff, Peacock, sole legatee under the will of Keen. The assignment was made under a statute authorizing executors, when all debts against the estate have been paid, to assign to legatees and heirs uncollected claims due the estate. The defendant alleged that he had paid the note to Keen in his lifetime, and offered himself as a witness. The Indiana statute of March 11, 1867, contains a proviso, " That in all suits where an executor, administrator, or guardian is a party, in the case where a judgment may be rendered either for or against the estate represented by such executor, administrator, or guardian, neither party shall be allowed to testify as a witness    .    .    .    ." The court *held*, that the assignment of the note by the executor to the legatee did not restore the competency of a witness who would have been incompetent if the action had been brought by the executor, and that the defendant could not testify. We call special attention to the very able opinion of *Buskirk*, C. J., 39 Ind. 32, 36. The decision in *Peacock* v. *Albin* was followed in *Fitzgerald* v. *Cox*, 39 Ind. 84.

Section 1, c. 2601, Laws 1862 (reënacted in G. L. c. 228, s. 19), was not intended to repeal any protection existing under the statute of 1857. The act of 1861 gives an additional test of exclusion, which embraces a class of assignees who were not previously pro-

tected, and at the same time affords a double protection to some assignees who were already protected by the statute of 1857.

If the foregoing views are correct, the deposition must be excluded on the ground that the statute protects one claiming through or under an executor just as much as it protects the executor himself.

But there is a broader ground on which the defendants can rest. The property would have been protected by the statute even if it had never passed through the hands of the executors. The terms "executor or administrator" are used by way of illustration to signify all persons claiming by *post mortem* title any interest in the estate of a deceased person, all persons claiming under a deceased person by title dating from his death. They were intended to include heirs and legatees. "Where it is clear that the person or thing expressed is put by way of example, the judges must fill up the catalogue. . . " Suppose the statute had named only executors: could it have been contended that administrators were not entitled to its benefit? It is not uncommon to use a word which, in its literal sense, is of narrow meaning "to signify the whole of the thing to which it belongs." The word is intended to include "all which it illustrates" in the connection in which it is used. In the statute of Westminster the First, *c.* 4, the words "man, dog, or cat" are construed to include all animals. It is there provided "that, where a man, a dog, or a cat" escapes alive, the ship shall not be adjudged a wreck. This is construed to mean "if any animal escape alive." " . . . these three instances are put but for examples." 2 Coke Inst. 167, 168. In *c.* 46 of the same statute, "the justices of the King's Bench at Westminster" are put by way of example for the purpose of describing all courts of justice, "for that all are within the same mischiefe, and therefore ought to be within the same remedy." 2 Coke Inst. 255, 256. So *c.* 31 of the statute of Westminster the Second, referring in terms only to the court of common pleas, is construed to include all courts. 2 Coke Inst. 426, 427; *Strother* v. *Hutchinson*, 4 Bing. N. C. 83. This method of interpretation is not applied exclusively to ancient statutes. One of the strongest instances of it is to be found in the construction put upon the modern statute of 7 and 8 Vict., *c.* 101, *s.* 2. The phrase "any single woman" in a bastardy act was held to include married women. *Reg.* v. *Collingwood*, 12 Q. B. 681; followed in *Reg.* v. *Pilkington*, 2 El. & Bl. 546. " . . . the law differently interpreted would fail to reach a very large proportion of illegitimate children." Lord *Denman*, C. J., 12 Q. B. 687. "It would be strange if one class of bastards, though small, were left entirely destitute, and there were no liability in the putative father." Lord *Campbell*, C. J., 2 El. & Bl. 553. So the statute now under consideration, if differently interpreted, would fail to reach a considerable proportion of representatives of the interest of deceased persons. It would be strange if one class of representatives were left entirely unprotected.

Here is a statute which was enacted, not for the personal benefit of executors, but for the protection of the estates of deceased persons. There is no reason why that protection should be given when the estate is represented by an executor, and withheld when it is represented by a legatee. In each case there is the same danger of false testimony, and the same improbability that the party representing the interest of the deceased would be able to disprove it. The legislature, confessedly having in mind the necessity of protecting the estate, named executors and administrators as the most common type of the representatives of deceased persons. They are named "by way of example." " When the expression in a statute is special or particular, but the reason is general, the expression should be deemed general." 1 Kent Com. 462.

It is, however, unnecessary for the defendants to contend that the terms " executor or administrator " are broad enough to include heirs and legatees. It is enough for the present case if these terms embrace all persons holding the estate of a deceased person in an official, representative capacity, for the benefit of the real parties in interest. That construction would include these trustees. So far as the present question is concerned, there is no substantial distinction between Clough and Foster, " executors," and the same Clough and Foster, " trustees." In either capacity Clough and Foster hold property derived from a deceased person, and hold it in a purely representative character.

*Crawford* v. *Robie*, 42 N. H. 162, is much relied on by the plaintiff. But there is a manifest distinction between that case and this. The legislature, in the passage of the acts of 1857 and 1858, did not contemplate protecting the estates of living men. That subject was not present to their minds in the enactment of the statute; but the subject of protecting the estates of dead men was unquestionably present to the legislative mind, and the statute was undoubtedly intended to afford effectual protection to such estates. To ask the court to say that the statutes of 1857 and 1858 protect the estates of living (but insane) men, is to ask them to extend their operation to a subject-matter entirely distinct from that upon which the legislature undertook to legislate. To construe those acts as effectually protecting the estates of dead men, is only to say that the language of the statutes is sufficient to accomplish the particular intent which the legislature had in view.

There is no reason why this statutory language, which was intended to preserve a common-law right, should receive a narrow construction.

" We regard the limitations imposed by our legislature upon the rights of parties to testify in suits where the heirs and representatives of deceased persons are parties, as eminently wise and just. It is better that a negligent man should occasionally suffer a loss which he has, in part at least, deserved by his carelessness, than to subject the property of all to the machinations of the numerous

horde of unscrupulous adventurers in litigation, at such an evident disadvantage." *Barrows*, J., in *Burleigh* v. *White*, 64 Me. 23, 25. "The words indicating the various personal relations and modes of succession protected by the statute, are liberally construed in furtherance of the equity of the rule. . . ." Abb. Ev. 64, 65. We call particular attention to the reasoning in *Dewey* v. *Goodenough*, 56 Barb. 54, 57–59, where it was held that the phrase "next of kin" in an exclusion statute includes a husband claiming by marital right of succession.

So in *Mattoon* v. *Young*, 45 N. Y. 696, 699, it was held that "assignees" (in an exclusion statute) includes grantees of land, *Grover*, J., saying, ". . . although grantees are not named in section 399, they come within the reason of the statute, and must, therefore, be held to come within it." In *Howell* v. *Taylor*, 11 Hun 214, the term "assignees" was construed as including donees of personal property. In *Lee* v. *Dill*, 39 Barb. 516, "representatives" was held to include heir of realty. So in *Davis* v. *Davis*, 26 Cal. 23, "representative of a deceased person" includes the party who has succeeded to the right of a deceased person, whether by purchase, descent, or operation of law. One who takes an assignment from a mortgagor in his lifetime is, after the mortgagor's death, entitled to be treated as a "legal representative of a deceased person." *Housel* v. *Cremer*, 14 N. W. Rep. 398. *Merrill* v. *Atkin*, 59 Ill. 19, 21, involved the construction of the statute provision excluding a party, where the adverse party sues or defends as "heir" of a deceased person. The plaintiff was permitted to testify to transactions between himself and M., now deceased. The defendant, who was the widow of M., claimed part of the premises in fee as heir of two deceased children of M., who had inherited from their father. Held error in permitting plaintiff to testify. *Lawrence*, C. J., said,—"It is said she is not claiming as heir of her husband. . . . It is true, she does not claim as the immediate heir of her husband, but she does claim as his heir through her children. She claims under him by inheritance. Under the word heirs are comprehended the heirs of heirs, *ad infinitum*." After referring to the intent to make the right to testify a mutual right, he added that the restriction "applies as well in favor of the heir by one remove, as in behalf of the immediate heir."

See further, as to liberal construction of statute, *Waldman* v. *Crommelin*, 46 Ala. 580; *Bennett*, J., in *Kimball* v. *Baxter*, 27 Vt. 628, 631; *Paine*, J., in *Knox* v. *Bigelow*, 15 Wis. 415, 421; *Thomas*, J., in *Fischer* v. *Morse*, 9 Gray 440, 441; *Stone*, J., in *McCrary* v. *Rash*, 60 Ala. 374, 377, where it was said that the court ought not to "cripple this salutary exception in its beneficent operation." See, also, *Stevens* v. *Hartley*, 13 Ohio St. 525; *Ellison* v. *Mounts*, 12 Ala. 472; *Stuckey* v. *Bellah*, 41 Ala. 700; *Fitzsimmons* v. *Southwick*, 38 Vt. 509.

A plaintiff cannot take a position upon the trial inconsistent with

the nature of his suit, nor with the material allegations of his bill or declaration. *Daniel* v. *Morton*, 16 Q. B. 198. A plaintiff cannot, for collateral purposes, insist upon the negative of the proposition upon the affirmative of which his right of action depends. Yet that is what this plaintiff seems to be trying to do. He proposes, apparently, to treat the interest of the estate of Herman Foster as an interest in real estate for the purpose of getting the deposition admitted; and then he proposes to turn round and ask for a decree on the ground that this same deposition shows the Foster interest to be personal estate. The very gist of his bill is, that the interest of those claiming under Herman Foster is not real estate, but consists entirely of personalty, viz., of notes, to which certain unforeclosed mortgages are mere incidental accompaniments. Yet, when arguing in favor of the admission of the deposition, he suggests that the Foster interest is "real estate in the hands of an heir or devisee." Now, the plaintiff cannot be permitted to "blow hot and cold" in this way. He cannot call the Foster interest personal at one stage of the case, and real at a another, according to the varying necessities of his case or his interest for the time being. He must call it one and the same thing at every stage of the case, and for all the purposes of the case. Certainly he cannot assume the Foster interest to be real for the purpose of introducing evidence to prove it to be personal. "Real estate when the evidence is offered, personal estate after the evidence is admitted," would seem to be the plaintiff's theory. But the plaintiff is bound to try the case from beginning to end, in perfect consistency with the nature of the claim set up in his bill. He has got to make out and sustain all his material allegations, and he must do it by methods which are consistent with the truth of those allegations. He cannot assume their untruthfulness for the purpose of proving their truthfulness. He cannot assume the negative for the purpose of proving the affirmative. If the plaintiff, for any purpose, takes the position that the interest of those claiming under the Foster estate is "real estate in the hands of an heir or devisee," we reply that such a position on the plaintiff's part is suicidal. It necessarily involves the admission that the mortgages were absolutely foreclosed in Foster's lifetime; and in that event the plaintiff has no case. If, on the contrary, the plaintiff adheres to the allegations of his bill, and says that Foster at his death was merely the holder of notes secured by unforeclosed mortgages, then we stand upon the positions which we have elsewhere fully argued: (1) That the executors are necessary parties to litigation over the Foster interest. (2) That, if the trustees are to be regarded as the present holders of the notes and mortgages, they are protected as having taken from, through, or under the executors.

The deposition is not admissible under *s.* 17, *c.* 228, G. L. (which is based upon P. L., 1865, *c.* 4,074). *Chandler* v. *Davis*,

47 N. H. 462; *Harvey* v. *Hilliard*, 47 N. H. 551; *True* v. *Shepard*, 51 N. H. 501; *Fosgate* v. *Thompson*, 54 N. H. 455.

The releases constitute a perfect and conclusive defence to this bill. The plaintiff says,—"A release of 'all causes of action' from the beginning of the world until now is not a transfer of real estate." This might be true of a general release, given by an owner of an unincumbered . estate to a stranger; but how is it in respect to a release given by a mortgagor to a mortgagee, especially to a mortgagee in possession? "There can be no doubt· that a mortgagee has such an estate in the mortgaged premises, that a simple release of the right to redeem will operate so as to make an absolute and indefeasible estate." *Shaw*, C. J., in *Hyde* v. *Baldwin*, 17 Pick. 303, 307. In that case a release of all demands was construed as embracing a release of the right of redemption. In *Moss* v. *Moss*, 95 Ill. 449, it was held that a resulting trust is barred by a general release of all claims and demands. The releases cannot be explained or controlled by parol evidence in Fellows's deposition, or by parol evidence from any source. *Sherburne* v. *Goodwin*, 44 N. H. 271, 276.

The title of Herman Foster under the mortgages is not affected "by the relation of attorney and client." "The master finds, so far as it is a question of fact, that Foster's title to the real estate under the mortgages assigned to him is not affected by the fact that he was employed as counsel by said Fellows." Foster's title is, therefore, good (so far as the objection is concerned), unless there. are facts stated in the report which necessarily, and as a matter of law, establish its invalidity. No facts are stated which justify such a conclusion. If Foster was counsel for both Fellows and his creditors, he was so with the knowledge and consent of both. Fellows confessed his inability to pay the debts, and made no objection to the foreclosure. Fellows consented to the purchase of the mortgages by Foster, and then, for more than twenty years, made no move to invalidate the purchase. "There was no evidence that pointed to any fraud or deception used by Foster." Taking all these facts together, a case is presented entirely distinguishable from the class of cases relied on by the plaintiff.

We have examined the cases cited in the plaintiff's brief. They are partly cases where the attorney purchased or took a mortgage for the client, partly cases where there was fraud in fact on the part of the attorney, and partly cases where the attorney, without the client's consent, made purchases from third persons which conflicted with the client's interest. None of these classes of cases are. applicable here. This was not a purchase from the client. It was a purchase from a third person of a charge or incumbrance upon the client's property, which the client admitted to be a valid charge. In *Hoitt* v. *Webb*, 36 N. H. 158, it was held, that, though an administrator cannot legally purchase the real estate of his intestate, yet he may purchase mortgages upon the estate of the

intestate. See 36 N. H. 164. The cases relied on by the plaintiff do not dispute the validity of such a purchase, if made with the knowledge and consent of the client. See, for instance, 12 How. 246, where *Nelson*, J., speaks of the attorney's becoming the purchaser "without communicating the fact to his client and obtaining his consent;" and again (p. 247), he speaks of a purchase by the attorney "in the absence of the client and without his consent." See, also, the qualification, "without the consent," in 52 Pa. St. 465, cited by the plaintiff.

Moreover, even if the plaintiff had not known of and consented to the purchase at the time, he must have indicated his election to claim the benefit of the transaction within a reasonable time after it came to his knowledge. "It is evident that, while the law gives to the client this ample protection, it must devolve upon him the reciprocal obligation of promptly notifying the attorney that he proposes to claim it. As soon, therefore, as he learns that the attorney has purchased for himself, he must at once exercise his election of claiming the benefit of the transaction." *Chalmers*, J., in *Johnson* v. *Outlaw*, 56 Miss. 541, 547. A delay of more than twenty years, with no satisfactory explanation, is too long. *Marsh* v. *Whitmore*, 21 Wall. 178 (delay of twelve years); *Johnson* v. *Outlaw*, *supra* (delay of five and a half years); *Champion* v. *Rigby*, 1 Russ. & M. 539 (delay of eighteen years). The plaintiff is not at liberty to argue that the delay was in consequence of his reliance on a verbal agreement of Foster's. The answer to that argument is, that the plaintiff has failed in his attempt to prove the existence of such an agreement.

If the plaintiff could have established the existence of a verbal agreement or understanding that Foster should hold the property in trust for the benefit of Fellows, he would not have needed to resort to the position that Foster's relation as attorney invalidated his title. But the plaintiff, having failed in the attempt to establish such verbal agreement, cannot now assume the existence of such an agreement for the purpose of proving misconduct in Foster as an attorney. In discussing the question whether the relation of attorney and client in this case does, as a matter of law, invalidate Foster's title, it must be assumed that there was no verbal agreement, and that it was understood that the mortgages were purchased by Foster entirely with his own funds and on his own account. The only question, then, is, whether there is any rigid rule of law which pronounces such a purchase a nullity, though made with the consent of the client, and acquiesced in by him for more than twenty years.

If there are any presumptions of fact adverse to attorneys in the investigation of their relations with their clients, it must be assumed that the master is familiar with them, and that they were duly taken into account by him in making up his findings of facts.

The proposed amendment was inadmissible. The administrator,

coming in to prosecute the intestate's suit, cannot introduce by amendment an entirely distinct cause of action. Fellows would not have been permitted to set up his own fraud to avoid Foster's title. Most certainly the personal representative of Fellows, coming in to prosecute the suit of Fellows, cannot be permitted to take a position which Fellows himself was estopped from taking. But the allowance of the amendment would not have changed the result. It does not appear that any of the present creditors of the estate of Fellows were existing creditors at the date of conveyances and foreclosures. Furthermore, the master expressly found that the title of Foster to the real estate, obtained by the foreclosures, "was not fraudulent as to creditors." Moreover, it is now too late for a creditor to impeach the conveyances on the ground of fraud. *Hathaway* v. *Noble*, 55 N. H. 508, is a decisive authority.

BLODGETT, J. The inquiry presented in this case is as to the admissibility of Fellows's deposition. This has been supposed by counsel to depend mainly upon the capacity in which the defendants Clough and Foster are to be considered as parties, namely, whether as executors or trustees. This question has been argued with very much acuteness and research; but in the view we have taken, it is one of no practical consequence.

The statute excluding a party as a witness when the adverse party is an executor or administrator applies to suits in equity as well as at law (*Robinson* v. *Wheeler*, 51 N. H. 384, 387), and, its object being to place parties upon an equal footing, it prohibits the living party to a transaction from giving his version of it when the other party, being dead, cannot testify. *Moore* v. *Taylor*, 44 N. H. 370, 375; *Chandler* v. *Davis*, 47 N. H. 462, 464, 465; *Harvey* v. *Hilliard*, *ib.* 551, 553; *Brown* v. *Brown*, 48 N. H. 90; *True* v. *Shepard*, 51 N. H. 501, 502; *Hoit* v. *Russell*, 56 N. H. 559, 563. These decisions demonstrate that a literal construction is not to be put upon the statute, but, on the contrary, that it is to be interpreted with reference to its general scope and object, which was to secure equality in the respect named between the living and the dead. Such being the undoubted purpose of its makers, it will, if possible, be construed and applied accordingly; and, therefore, we have no hesitation in affirming the ruling of the master, excluding so much of the deposition as relates to matters concerning which Herman Foster, if alive, could have testified. For, as argued by counsel for the defendants, the statute manifestly was not intended for the personal benefit of the executor, but for the protection of the property of the estate; and it can, therefore, make no conceivable practical or equitable difference whether Clough and Foster hold the property in controversy as executors of Herman, or as trustees under his will, inasmuch as it is obviously entitled to the same protection in the one case as in the other.

Nor do we think it makes any substantial legal difference; for, as executors, they held the property simply as trustees for the creditors of the testator and the beneficiaries named in his will; and if they have ceased to be executors, they have not ceased to be trustees, but still hold the property in trust for the same creditors and beneficiaries, and with no estate or beneficial interest in the property itself beyond what is adequate for the performamce of the trust. The change, if any, is technical and nominal rather than actual and substantial, and affords no sufficient reason why the statute protection should be withdrawn. Indeed, it is impossible, outside of the literal words of the statute, to give any reason why protection should be extended in the one case and not in the other; and it will not, therefore, be done unless the statute imperatively requires it. We are of the opinion that it does not; and in arriving at this result we are not compelled to base our conclusion upon the general rule that an assignee takes all the rights of his assignor, or to hold that the phrase " executors or administrators," as used in the statute, is broad enough to include heirs and beneficiaries; but we put it upon the ground that the terms of the statute, taken in connection with its undoubted intent, are broad enough to embrace " all persons holding the estate of a deceased person in an official representative capacity." Further than this we do not go, nor is it necessary for the purpose of the case.

The protection of the estates of deceased persons having been the controlling consideration which must have actuated the legislature, it may well be held that executors and administrators are specifically named in the statute merely by way of illustration and example, and as expressing the names commonly used in referring to the representatives of deceased persons (Bish. Wr. L., ss. 190, 191); and we construe it accordingly. This construction appears to us to be the only one consonant with reason and discretion, and clearly does not extend beyond the mischief contemplated by the makers of the statute, or beyond the limits of its language, unless it be taken literally. It is not, therefore, as contended for the plaintiff, legislative, but administrative; it is not altering the law, but expounding it; it is not declaring what, in our judgment, the legislature ought to have intended, but what they manifestly did intend. And it is obvious, moreover, that a contrary construction would frequently not only give to the statute an unjust operation, but would also defeat its object, and lead to the most absurd consequences; and where these results would follow from a literal interpretation, the familiar principle that the intent, and not the literal meaning, must be regarded, is applicable.

The deposition being within the prohibition of the statute, and nothing appearing to justify its admission on the ground of injustice, the plaintiff has no ground of complaint upon this branch of the case.

The second inquiry is in respect to the foreclosure of the city mortgage, so called.

The master finds that it was legally foreclosed so far as the determination of this question depends upon any finding of the facts, and we see no ground to question the correctness of his finding. But it is objected that, as matter of law, the proceedings conferring possesssion were invalid, and, therefore, nugatory for any purpose of foreclosure. Suppose this to be so, it cannot avail the plaintiff. The objection comes too late. The foreclosure was in 1854; no defect or illegality appears upon the face of the proceedings; and advantage of an irregular foreclosure must be taken within a a reasonable time. 2 Jones Mort., 2d ed., s. 1,054. This long since elapsed. But if it were otherwise, the objection is none the less unavailing. There was an entry under process of law which became part of the public records, and which gave Foster at least color of title; and as it was followed on his part down to his decease, more than twenty years afterwards, by peaceable, continuous, visible, and exclusive possession and occupation of the mortgaged premises under claim of title, it is immaterial whether the foreclosure was valid or otherwise, because in either event the title became perfected in Foster before his decease, by lapse of time. *Grant* v. *Fowler*, 39 N. H. 101, 104, and cases cited; *Forest* v. *Jackson*, 56 N. H. 357, 362. And, in any view, the right of redemption, and to an accounting of the rents and profits, was long since barred; for, having permitted Foster to hold possession of the premises for twenty years without accounting, and without admitting that he possessed a mortgage title only, Fellows lost his right of redemption and to an accounting. The relation of mortgagor and mortgagee ceased to exist, and Foster's title became absolute in equity as well as in law. 2 Sto. Eq. Jur., 12th ed., s. 1,028 a and b. " Twenty years unexplained possession by the mortgagor bars the right of the mortgagee to the land, upon the presumption that the mortgage debt has been discharged. So, twenty years unexplained possession by the mortgagee bars the right to redeem, upon the presumption that the right has been released, and in some way lost." *Perley*, C. J., in *Green* v. *Cross*, 45 N. H. 584.

It is true, nevertheless, that this presumption may in either case be rebutted by circumstances, and the relation of attorney and client between Foster and Fellows is relied upon by the plaintiff for this purpose. But the finding of the master is, that so far as the question is one of fact, Foster's title is not affected by the fact that he was employed as counsel by Fellows; and we do not find anything in the report, which, as matter of law, defeats the effect of Foster's possession, as a bar to the right of redemption. On the contrary, the express finding of the master is, that " there was no evidence that pointed to any fraud or deception used by said Foster." In view of these findings, it must be held that Foster's relation as attorney (which apparently ceased many years before his

death) did not invalidate his title under the city mortgage, so called, or any of the other mortgages which were assigned to him.

But beyond all this, we think that the releases under seal from Fellows to Foster, which, with one exception, were executed after the relation of attorney and client had terminated, must be held to operate as a bar to the maintenance of the plaintiff's bill. A release under seal is conclusive between the parties, in the absence of fraud in obtaining it (*Sherburne* v. *Goodwin*, 44 N. H. 271; *Ellsworth* v. *Fogg*, 35 Vt. 355; *Perkins* v. *Fourniquet*, 14 How. 327); and, if given to one in possession of lands, whether by right or wrong, by one having a right to the same, it will operate to pass such right. *Everenden* v. *Beaumont*, 7 Mass. 76; *Poor* v. *Robinson*, 10 Mass. 131, 134. The master finds not only that there was no fraud in obtaining the releases, but that Fellows, a man of acknowledged capacity, executed them understandingly. Taking this to be so, the necessary effect is to uphold the releases; and to uphold the releases is not only to establish a perfect defence to the plaintiff's bill, but also to render immaterial all, or substantially all, of his requests for additional findings.

And if the releases are not upheld the plaintiff stands no better, inasmuch as the facts undeniably show gross laches and neglect on the part of Fellows, even if his version of the transactions between Foster and himself, as set forth in the bill, be accepted as true; and where there have been such laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights, no doctrine is better established than that a court of equity will refuse to interfere. *Hathaway* v. *Noble*, 55 N. H. 508; 2 Sto. Eq. Jur., *s*. 1,520. It is true that cases of trust constitute an exception; but this is so only so long as the relation continues. " Where this relation is no longer admitted to exist, or time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances, give rise to presumptions unfavorable to its continuance,—in all such cases a court of equity will refuse relief upon the ground of lapse of time, and its inability to do complete justice." 2 Sto. Eq. Jur., *s*. 1,520 *a*; 2 Per. Tr., *ss*. 869, 870. In short, many insuperable difficulties attend the plaintiff's case.

After a large part of the evidence had been introduced at the hearing, the plaintiff asked to amend his bill, and claim relief upon the ground of the insolvency of the estate, and, consequently, that the conveyances were fraudulent as to creditors. The master declined to consider the propriety of the proposed amendment, and refers the question of its admissibility to the court.

The defendants object on two grounds,—first, because it introduces an entirely distinct cause of action; second, because Fellows, if alive, could not be permitted to set up his own fraud to avoid Foster's title, and so the administrator of Fellows is estopped from taking a position which Fellows himself was estopped from taking.

But this conclusion does not follow; for, although the general doctrine is that a fraudulent transfer is good as against the grantor, his heirs, executors, administrators, agents, and parties claiming under him (Bump Fr. Conv., 2d ed., 437, 438, and cases cited), yet there is in this state a well recognized exception in the case of insolvent estates, and it is here held that the administrator of such an estate is not bound by the fraudulent conveyance of his intestate. *Kingsbury* v. *Wild*, 3 N. H. 30; *Abbott* v. *Tenney*, 18 N. H. 109; *Leavitt* v. *Leavitt*, 47 N. H. 329. These decisions go upon the ground, as stated by *Parker*, C. J., in *Abbott* v. *Tenney*, that " an administrator of an insolvent estate is emphatically the representative of the creditors," or, as stated by *Bellows*, J., in *Leavitt* v. *Leavitt*, *supra*, that he represents both the heirs and the creditors, and so, while as representative of the former he cannot impeach the conveyance, yet as representative of the latter, and in their behalf, he may impeach it. The plaintiff, therefore, is not estopped to deny the validity of his insolvent intestate's conveyances, for the reason assigned by the defendants; and, under the liberal rule as to amendments which now prevails in this jurisdiction, the asked for amendment is allowed. Nevertheless, we hold, that its allowance is utterly useless as affecting the title to the property obtained through the foreclosure, not only because the creditors have become estopped to impeach the conveyances by the lapse of time (*Hathaway* v. *Noble*, *supra*), but because it is distinctly found by the master that Foster's title so obtained was not fraudulent as to creditors.

In regard to the homestead at Goff's Falls, it appears that on February 14, 1866, Foster obtained judgment as of mortgage for the possession of the premises, but that possession was never taken under the judgment, and that a suit of *scire facias* has been sued out thereon, since Foster's death, by his executors, which is now pending in the trial term. If any questions as to this property are before us, they have not been argued by the counsel, and we express no opinion upon this branch of the case.

The defendants' motion at the trial term for a judgment establishing the foreclosures reported by the master should be granted, and a decree, in substance as follows, entered up:

Upon the report of the master being submitted to the court, and after hearing the arguments of the counsel thereon, it is adjudged and decreed, that the mortgage from Moses Fellows to the city of Manchester, and assigned by the city to Hunt, and by him to Tompkins, and by the latter to Herman Foster; and the mortgage from Fellows to Montgomery, and by Montgomery assigned to Hale, and by Hale to Herman Foster, were foreclosed as alleged by the defendants in their answer; that the plaintiff's bill be dismissed, but as to the Goff's Falls property, the dismissal is without prejudice.

STANLEY, SMITH, and CLARK, JJ., did not sit: the others concurred.